DISTRICT COURT
ERN DISTRICT OF LOUISIANA
RECEIVED

NOV 1 2 2015

TONY R. MOORE, CLERK
BY _____ MB

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

CHARLES E. COLEMAN, JR. ET AL          CIVIL ACTION NO. 2:13-0561

VERSUS                                 JUDGE JAMES T. TRIMBLE, JR.

WING ENTERPRISES, INC.                 MAG. JUDGE KAY
d/b/a LITTLE GIANT LADDER

■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■ ■

<u>MEMORANDUM RULING AND ORDER</u>

Before the court are two motions: (1) "Defendant's Daubert Motion to Exclude or Limit Testimony of Plaintiffs' Expert, Thomas Shelton" (R. #47) and "Defendant's Daubert Motion to Exclude or Limit Testimony of Plaintiffs' Expert, John Schwartzberg" (R. #48).  The motions have been fully briefed and oral arguments were heard on October 28, 2015.

In this lawsuit, plaintiff, Charles E. Coleman, Jr., alleges damages under the Louisiana Products Liability Act ("LPLA") for injuries he allegedly sustained when he fell from a ladder manufactured by defendant, Wing Enterprises, Inc. d/b/a Little Giant Ladder ("Wing").  Plaintiff asserts in his complaint that the ladder was unreasonably dangerous in design and that the manufacturer's warnings were inadequate.

Plaintiffs have retained two experts: Dr. Thomas Shelton, as an expert in ladder design and to opine as to how the accident occurred, and John Schwartzberg as an expert in warnings.

The burden of proof of any plaintiff asserting a claim under the Louisiana Products Liability Act is found in LSA-R.S. 9:2800.54 which provides as follows:

**Manufacturer responsibility and burden of proof**

A.  The manufacturer of a product shall be liable to a claimant for damage proximately caused by a characteristic of the product that renders the product unreasonably dangerous when such damage arose from a reasonably anticipated use of the product by the claimant or another person or entity.

B.  A product is unreasonably dangerous if and only if:

(1) The product is unreasonably dangerous in construction or composition as provided in R.S. 9:2800.55;

(2) The product is unreasonably dangerous in design as provided in R.S. 9:2800.56;

(3) The product is unreasonably dangerous because an adequate warning about the product has not been provided as provided in R.S. 9:2800.57; or

(4) The product is unreasonably dangerous because it does not conform to an express warranty of the manufacturer about the product as provided in R.S. 9:2800.58

C.  The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.55 must exist at the time the product left the control of its manufacturer. The characteristic of the product that renders it unreasonably dangerous under R.S. 9:2800.56 or 9:2800.57 must exist at the time the product left the control of its manufacturer or result from a reasonably anticipated alteration or modification of the product.

D.  The claimant has the burden of proving the elements of Subsections A, B and C of this Section.

In addition, Louisiana courts hold that defects in any product are not presumed based on the mere occurrence of an accident.[1]

---

[1] Spott v. Otis Elevator Co., 601 So.2d 1355 (La. 1992).

Defendant moves to exclude Thomas Shelton's testimony on the grounds that (a) he lacks the experience and training requisite for qualification as an expert witness on the subject of warnings, and (b) his opinions are not validated by sufficient factual and scientific support, and are therefore unreliable under  Daubert v. Merrill Dow Pharmaceuticals,.[2] Defendants move to exclude the testimony of John Schwartzberg because (a) he is not an expert in warnings, and (b) his opinions are not supported by a sufficient foundation to qualify for admissibility under Daubert.

*Thomas Shelton*

Defendant maintains that Shelton's testimony is inadmissible under Federal Rule of Evidence 702 because he is not an expert in warnings, and because his opinions are merely speculative and without factual basis.  Thus, defendant moves to bar Shelton from rendering any opinions relating to the sufficiency of instructions or warnings in this case.  Defendant further seeks to exclude Shelton's opinions as to what caused Mr. Coleman's fall because Shelton's opinions are not supported by the facts, and are merely speculative.

Shelton opines that "the ladder can become unstable and fall in a manner described by Mr. Coleman if the top hinge locks are not fully engaged."[3] He then concludes that "Mr. Coleman's accident occurred as a result of the hinge locks not being fully engaged."[4]

---

[2]  113 S.Ct. 2786, 2799 (1993).
[3] Defendant's exhibit C, Shelton Report, p. 5.
[4] Id. p. 6.

This court has broad discretion in qualifying an expert witness, and in determining the admissibility of expert testimony.[5]   Part of the court's determination is based on the knowledge, skill, experience, training and education of the proffered expert.[6] This determination is intended to ensure "that an expert's testimony both rests on a reliable foundation and that it is relevant to the task at hand.[7]   An expert witness may offer specialized or technical opinion evidence when based (1) on "sufficient facts or data"; (2) "the product of reliable principles and methods"; and (3) when "the expert has reliably applied [those] principles and methods to the facts of the case.[8]

To be admissible, the court must find that the evidence is both relevant and reliable.[9] Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid.[10] The reliability inquiry under Daubert is a flexible one, permitting the district court to identify the most germane considerations in light of the nature of the issue, the particular expertise and the subject of the expert's testimony.[11] This court will consider the following factors in determining whether an expert's opinions are admissible:

1.   Whether the theory, technique or conclusion can be tested;

2.   Whether the theory, technique or conclusion can be subject to peer review and publication;

---

[5]   Richmond Steel, Inc. v. Puerto Rican American Ins. Co., 954 F.2d 19, 21 (1st Cir. 1992); Black v. Ryder/P.I.E. Nationwide Inc., 930 F.2d 505 (6th Cir. 1991).
[6] Federal Rules of Evidence 702.
[7] Daubert v. Merrill Dow Pharmaceuticals, 113 S.Ct. 2786, 2799 (1993).
[8] Fed. R. Evid. 702.
[9] Pipitone v. Biomatrix, Inc., 288 F.3d 239, 243 (5th Cir. 2002).
[10] Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352 (5th Cir. 2007).
[11] United States v. Valencia, 600 F.3d 389, 424 (5th Cir. 2010)..

3.   Consideration of the known or potential error rate;

4.   Whether there are controlling standards for the methodology used to reach the conclusion proper, and whether such controlling standards were appropriately followed; and

5.   Whether the methodology or conclusion is generally accepted in the relevant, scientific discipline.[12]

Relevance depends on whether the reasoning or methodology underlying the testimony can be properly applied to the facts in issue.[13] Evidence is relevant if it assists the trier of fact to understand the evidence or to determine a fact in issue.[14]

*Expert on warnings*

Defendants contend that Shelton does not qualify as an expert on warnings because he does not have the requisite education, experience or training, nor does he claim to be an expert on warnings or hold himself out as an expert in that field. Shelton is a metallurgist and mechanical engineer. Shelton admits that he is not qualified to testify as an expert in warnings. He testified as follows:

Q.    … do you have any expertise in evaluating warnings and instructions, and specifically the warnings and instructions from Mr. Coleman's ladder?

A.    I am not a warnings expert.  That is not an area I have studied.  I do have a fair amount of experience in writing instructions for use of equipment.

Q.    Okay.  So you do not hold yourself out as a warnings expert?

---

[12] Id.
[13] United States v. Ebron, 683 F.3d 105, 139 (5th Cir. 2012) (citing Pipitone v. Biomatrix, Inc., 288 F.3d at 247).
[14] Id. (Citing Daubert, 509 U.S. at 591).

A.      That is correct.

Q.      . . . Do you consider yourself an expert on the instructions in the pamphlets or on
the ladder with regard to explaining to a consumer how to use it?

A.      No. I don't hold myself out as an expert in that area.[15]

Plaintiffs remark that Shelton is not offering an opinion as to defendant's alleged inadequate warnings.  Accordingly, the court will grant defendants' motion to the extent that Dr. Shelton will not be permitted to testify as to any inadequate warnings and/or instructions.

*Admissibility*

Defendant seeks to exclude Shelton's testimony with respect to articulating ladders because of his lack of experience with articulating ladders. Defendant also argues that Shelton's opinions are subjective and he has not laid the requisite scientific foundation for his opinions to be admitted under a Daubert analysis.  Defendant complains that Shelton fails to base his opinions on physical evidence in this case and that "his" tests are not based on known facts in this case.

Plaintiffs offer Shelton's qualifications as an engineer.  Dr. Shelton is a licensed professional engineer and has over 31 years of experience.[16] He earned a Bachelor of Science in Engineering, a Master's of Science in Materials Science and Engineering, and a Ph.D. in Mechanical Engineering.[17] Shelton provided consulting services since 1969 and has been the President for Metallurgical & Materials Technologies ("MMT")[18] since 1984. Shelton has personally conducted and/or supervised over 2,500 failure analysis investigations since 1983.[19]

---

[15] Defendant's exhibit B, Shelton depo. pp. 52-53.
[16] Plaintiffs' exhibit A, Shelton Affidavit; Plaintiffs' exhibit C, Curriculum Vitae.
[17] Plaintiffs' exhibit A; plaintiffs' exhibit B, Shelton depo. p. 29; plaintiffs' exhibit C.
[18] MMT is an engineering consulting firm concerned with materials testing and failure analysis.
[19] Plaintiffs' exhibit B. pp. 30-33; plaintiffs' exhibit A.

He is also an adjunct faculty member at Louisiana State University in the Department of Mechanical Engineering.[20]

Shelton has qualified as an expert before State and Federal courts on numerous occasions in the field of metallurgical engineering and mechanical engineering with specialization in failure analysis.[21]

Plaintiffs argue that Shelton inspected and analyzed the ladder using standard and accepted forensic analysis methods, procedures and protocols which included (a) a visual inspection of the ladder; (b) photographic documentation of the ladder; (c) determination of the dimensions of the ladder; (d) optical examination of failed components on the ladder; (e) inspection and testing of an exemplar ladder, including but not limited to, climbing up, deploying and observing the function of the ladder and the function and characteristics of the palm buttons and hinges; (f) development of three-dimensional CAD (Computer-Aided Design) and FEA (Finite Element Analysis) models of the ladder; (g) stress analysis to determine the load carrying capacity of the ladder; and (h) a review of the deposition testimony and discovery productions.[22]

Defendant contends that Shelton's opinions are not supported by the facts, but instead rely on assumptions. Specifically, Shelton conducted one test which purportedly (1) was not reported to have been conducted on the same or a similar surface to the one where Mr. Coleman suffered his accident; (2) was not conducted with a known coefficient of friction (slip resistance) between the exemplar ladder and the surface of the floor in question; (3) was performed contrary

---

[20] Plaintiffs' exhibit A; plaintiffs' exhibit C.
[21] Plaintiffs' exhibit A.
[22] Plaintiffs' exhibits A and B, pp. 9-10, 16-17, 21-23, 55-58, 65-66, 105.

to the direct testimony of plaintiff with regard to how the accident occurred; and (4) was in no way substantially similar to Mr. Coleman's claimed accident.

Defendant further challenges Shelton's opinions in that they failed to identify any facts that would support a finding under the Louisiana Products Liability Act that the ladder was unreasonably dangerous in design or to offer an alternative design.

Defendant complains that Shelton's experience with articulating ladders is limited. Shelton has only worked on one case involving an articulating ladder, and that particular case did not involve the hinge mechanism which is the sole issue in this case. Shelton has not published articles regarding ladders, has not performed any design work for any ladders, and he has never been to any ladder manufacturing facility to analyze the process or to do any testing.[23]

More significantly, defendant contends that Shelton's opinions are unreliable because they fail to exclude the most likely scenario as to the cause of Mr. Coleman's accident—that he lost his balance and fell. Shelton testified as follows:

> Q.     The damage to the ladder and the description given by Mr. Coleman could also be consistent with him just losing his balance and falling towards the wall while he's on the ladder?
>
> A.     Yes, sir. Except for you, you know, the sensation of him falling straight down.[24]

Next, defendant maintains that Shelton's theory of causation assumes facts in direct contradiction with the evidence. Consequently, defendant argues that Shelton's opinion is speculative and unsupported by rigorous scientific methodology. Defendant points out that

---

[23] Defendant's exhibit B and C.
[24] Defendant's exhibit B, p. 111.

Shelton did not interview the plaintiff, did not examine the scene of the accident, but relied on photographs of the accident scene, and failed to base his opinion on the known facts.

Defendant complains that Shelton did not test the ladder under the same circumstances that existed at the time of plaintiff's fall.  Coleman testified that on the day of the accident, he set the ladder up in the A-Frame position.  He moved the ladder around the room he was painting at least three times, but did not change the ladder's position—locked in the A-Frame position.  In other words, he did not unlock the hinge mechanism or otherwise adjust the ladder.[25] Coleman further testified that he was not in any way confused as to how to properly position the ladder.

When Shelton performed his test on the ladder to simulate Coleman's fall and support his theory of causation, he set the ladder up in the A-Frame position and then depressed the palm buttons on the ladder which unlocks the hinge mechanism.  He then began climbing the ladder and also moved it around to see what reaction he would get. Defendant complains that Shelton did not document the test results, did not determine the drag coefficient of the floor where the accident happened, did not describe the test in his report and admitted in his deposition that the test was not performed in accordance with the known facts provided by Coleman regarding the accident.  Defendant relies on Shelton's deposition testimony in the following colloquy:

> Q.      What tests did you do?
>
> A.      Well, basically, visual examination is a test in metallurgical terminology, failure analysis terminology. The FEA analysis is a test. You know, unlocking the buttons and standing on the rung to see if it would slide is a test.  Picking it up and moving it with the buttons latched and unlatched is a test.

---

[25] Defendant's exhibit A, pp. 42-53.

> Q.    Okay.  So, in essence, you put it - -
>
> A.    I put it up and then I unlocked it.
>
> Q.    And then you unlocked it and you climbed it in that position?
>
> A.    Right.[26]

Shelton further testified as follows:

> Q.    You don't have any indication that that's what Mr. Coleman did in the accident, that he locked it in the A-Frame position and then unlocked it to climb it?
>
> A.    As we talked about, no.[27]

Defendant argues that Shelton's test should have been performed based on Mr. Coleman's testimony – that he moved the ladder without changing the A-Frame position. Instead, because Shelton was not aware of what position the ladder was in when Mr. Coleman fell, he made the assumption that it was not locked which he based entirely on Coleman's testimony that he had a sensation of falling straight down.[28]

In his report, Shelton determined the following:

> Mr. Coleman's accident occurred as a result of the hinge mechanism not being fully engaged.  The damage to the ladder, the wear on the inside edge of the plastic feet on the ladder, and the testimony of Mr. Coleman are consistent with the feet of the ladder slipping, resulting in separation of the front and back sides of the ladder and Mr. Coleman falling against the wall and pushing the

---

[26] Defendant's exhibit B, pp. 105-106.
[27] Id. p. 106.
[28] Id. pp. 89-90.

ladder away from the wall with his feet and body as he fell between the wall and the ladder.[29]

As quoted from Shelton's testimony above, the only basis for his opinion that Mr. Coleman's accident is inconsistent with his simply losing his balance and falling toward the wall is Mr. Coleman's testimony that he had the sensation of falling straight down. Shelton disproves Mr. Coleman's account of falling straight down by his own analysis of the physical evidence at the scene. His testimony is as follows:

Q.   If the ladder was past the A-frame position, based on Mr. Coleman's description, wouldn't you expect the ladder to be flat on the floor after the accident?

A.   Not necessarily, no. As I told you, when it slipped on me, it fell to the side.  It was still in an A-Frame position.

Q.   You said you jumped off of it to the side.

A.   I jumped off of it to the side.

Q.   Did Mr. Coleman describe anything like that?

A.   No. No, he - -  but it's obvious he fell off of it to the side, because he fell on top of the legs.

---

[29] Plaintiffs' exhibit A, ¶ 30 and C, p. 6, ¶ 6.

Q.     Right.

A.     <u>And for the ladder to be laying on the floor, pointing away
       from the wall, and the injuries to his left side, he definitely
       went toward the wall and pushed it away.</u>[30]

As is apparent from the above testimony, Shelton effectively disproved the plaintiffs'

account of how the accident occurred and yet holds fast to his theory that the hinge mechanism

was not secured based on Mr. Coleman's disproven recollection. This so-called "scientific

analysis" is anything but, and is totally self-contradictory.

Because Shelton's test and resulting theory of causation were based on assumptions

which are inconsistent with the facts of this case, the court finds that Shelton's test is not reliable

because it was not developed in a scientific manner.

Finally, defendant maintains that plaintiff's expert has failed to provide evidence that the

ladder was unreasonably dangerous in design. While Shelton criticized the ladder to the extent

that the hinge mechanism did not lock into place when the first click sounded, defendant argues

that Shelton failed to offer an alternative design. During oral arguments, counsel for plaintiffs

furnished the court with a photograph of an exemplar ladder which the parties agreed was one

exactly like Mr. Coleman's damaged ladder, of course without the damage. Defense counsel

advised that the photograph, which is appended to this opinion, represents the ladder in its

proper A-Frame position with the hinges locked. Defense counsel further stated that the first

click, which Shelton concluded would be possibly misleading to a user, is audible when the legs

of the ladder are about half way between the closed and the fully locked position. Counsel for

---

[30] Defendant's exhibit B, p. 112. Emphasis added.

plaintiffs in no way challenged defense counsel's representation despite the fact there were three plaintiffs' attorneys present and listening to Mr. McGuire's recitation of the facts. A cursory examination of the photograph tells the observer that if the back and front legs were half way between the properly locked position, the ladder would be so near vertical at the time of the first click that any reasonable (sane?) user would realize that it would be unsafe to ascend the ladder in that position. The evidence in this case is that Mr. Coleman was well versed through his employment with Texas Eastern pipeline in the use of ladders. This court cannot imagine his attempting to climb the ladder in its position at the first click.

In summary, Shelton performed no tests in conformity with the known facts in this case to demonstrate the alleged "instability" of the ladder; he purposely depressed the palm buttons while the ladder was in the A-Frame position, knowing this would have the effect of unlocking the ladder. Knowing the ladder was unlocked, he proceeded to climb the ladder, while moving from side to side and as would be anticipated by any reasonable person, the ladder became unstable. There is no proof whatsoever that Mr. Coleman depressed the palm buttons while ascending his ladder. Further, Shelton, through his examination of the physical evidence, proved that the accident could not have happened by Mr. Coleman falling straight down. In fact, it would seem to the court that the only two explanations for a fall straight down would be if the rung on which the plaintiff was standing broke or the hinges became unlocked causing the front and rear legs of the ladder to separate and the ladder effectively assuming the extension position. The physical evidence does not support either occurrence. What is apparent to the court based upon a careful review of Shelton's testimony is that he developed an unwarranted focus on the hinge mechanism to support a theory of liability on the manufacturer and was willing to adhere to his

ultimate opinion in the very face of his own conclusion that this accident did not occur as described by the plaintiff. The court finds no basis in Shelton's testimony that the design of this ladder was defective, but even if we assumed that some defect was present in the hinge locking mechanism, the evidence is devoid of any facts linking a malfunction of the hinge mechanism to Mr. Coleman's mishap. The court will not allow Shelton to testify as to his attempted reconstruction of this accident or any opinion as to the design or construction of the ladder in question.

Under Louisiana law, proof of defective design must comport with the standard set forth in Louisiana Revised Statute 9:2800:

### § 2800.56. Unreasonably dangerous in design

A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:

(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and

(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product.

Shelton testified as follows:

Q.     Do you have any criticism or complaint with regard to the engineering of the hinge mechanism of this ladder?

A.     I'm not sure it's engineered; but the mechanism, do I have a complaint with the mechanism itself?

Q.      Yes.

A.      You know, the only complaint I would have is that if you are not watching it or not familiar with the use, the actuation of these ladders, the first click – I will state that more important, the first click could be confusing to someone.  They could interpret that as it locking into place and not look.[31]

A review of the record reveals that there is no evidence that Coleman was confused by the clicking sound that the hinge mechanism made when he set the ladder in the A-Frame position. Furthermore, as noted by defendant, Shelton testified that he was not confused by the clicking and he offered no alternative design.

*John Schwartzberg*

Plaintiffs have engaged Mr. Schwartzberg to provide expert testimony regarding warnings deficiency and design deficiency with respect to the ladder at issue.

*Warnings expert*

Mr. Schwartzberg has an undergraduate degree in journalism and political science, a Bachelor of Science degree, and a further Bachelor of Science degree in metallurgical engineering.  He is licensed in several states as a professional engineer.  His professional experience involves materials testing, analysis of metallurgical failures and safety engineering. He has also taught in the Engineering Technology Program at the Metropolitan State College of Denver. When asked about specific training with regard to consumer warnings on products, Mr. Schwartzberg testified at page 17 of his deposition as follows:

---

[31] Defendant's exhibit B, p. 102.

Q.      Any---anything that you could specifically, even if you can't recall today that you can maybe go back and look, some specific training that you've had with regard to consumer warnings on products, warnings on consumer products?

A.      I—I don't know that I could laundry – list specifics, but seminars, webinars, courses that involve warnings, have been there.  I can't point to them specifically for you.

At pages 18 and 19 of his deposition, Mr. Schwartzberg was unable to provide a reference to a single case in which he had been recognized as an expert on the specific topic of consumer warnings.

At pages 27 and 28 of his deposition, Mr. Schwartzberg was unable to identify a single product in which he participated in the development of a consumer warning.   Mr. Schwartzberg was unable to point to any ANSI standard which the warning provided with the subject ladder violated.   That included the specific standard 14.2, 2000 Edition, and 2007 Edition which references with particularity the ladder that Mr. Coleman was using.   The warning/instruction specifically criticized by Mr. Schwartzberg is one that is applied to the side leg of the ladder about three feet from the top when the ladder is placed in the A-Frame position.   Mr. Schwartzberg believes that the instruction is ambiguous because it provides no specific reference to a first and second click which are audible as the ladder is placed in the A-Frame position.

The Court has discussed in some detail the position of the ladder when the first click is heard before the second click sounds when the ladder is in the proper A-Frame position.  The evidence in this case does not indicate that the plaintiff, Mr. Coleman, was confused by the instructions or had any difficulty in understanding the instructions regarding placing the ladder in the A-Frame position properly.  He had used the ladder on several occasions prior to the date

of the accident and had in fact used it in two different locations before moving it to a third location where his accident occurred.

A second criticism of Mr. Schwartzberg claims that the pictorial represented in the referenced instruction is ambiguous or confusing.  He states that while the instructions are clear to him because he knows how the hinge mechanism works, he poses the question whether or not the pictorial and accompanying verbiage present a conundrum beyond his mother's capacity to unravel.  No information is provided with respect to the age, mental and physical condition, etc. of Mr. Schwartzberg's mother.  The "mother test" suggested by Mr. Schwartzberg is unknown to the Court and unreferenced to scientific publications by Mr. Schwartzberg.  The test is whether a reasonable user of the product in question would be confused by the instruction.  Again, no evidence in the record speaks of any such confusion on the part of Mr. Coleman.  In Mr. Coleman, we are dealing with an individual with many years' experience using ladders in his employment and some experience using this particular product without mishap.    Mr. Schwartzberg is also critical of where the warning label is situated, which is about three feet from the palm knobs at the top of the ladder, down on the leg of the ladder.  He suggests, at pages 106 and 107 of his deposition, the following:

> Q.      Where---where would you put it?
>
> A.      Well, I—I think I'd be more inclined to actually put it on the top rung.  The—the idea is—is to get some information to the user in close proximity to where the—the hazard exists so that, you know, it will prompt them or at least you have a fighting chance of prompting them or getting them to either be aware of something that they weren't or draw something from their deep memory to their conscience memory at the time they need it.

This Court is at a loss in determining either a scientific or rational reason for Mr. Schwartzberg's optional placement theory.  No satisfactory scientific reason is given.  Rationally, when a user is preparing to put the ladder in the A-Frame position, the top rung of the ladder would be above his head as he separates the legs to the appropriate width, so he would have to climb the ladder to read the instruction on the top rung.  Mr. Coleman expressed no problem ascertaining where the instruction was or having any problem remembering the instruction between the time he may have read it and the time the ladder was in position.

The Court concludes that Mr. Schwartzberg has not established that he is by any means an expert in the field of consumer warnings, either by education, training, or experience.  Despite being unable to point to any established standard violated by defendant, he simply throws out criticisms or suggestions that are totally subjective and otherwise without foundation.

Mr. Schwartzberg will not be recognized by the Court as an expert in the field of consumer warnings.

*Defective Design*

Mr. Schwartzberg, at pages 29-30 of his deposition, explained that he did not perform an independent reconstruction of Mr. Coleman's accident, but rather accepted and relied upon the one performed by Dr. Shelton.  An accident reconstruction, he said, was not within the scope of what counsel for plaintiffs asked him to do in this case.  Relying on Dr. Shelton's misplaced focus on the hinge mechanism of the ladder while in the A-Frame position, Mr. Schwartzberg concluded that a user could be misled by an initial audible click that would lead him to believe the ladder was in the appropriate A-Frame position.  This has been dealt with hereinabove in the discussion

concerning Dr. Shelton's testimony.   Nowhere in the record is there any evidence that Mr. Coleman relied upon one or two clicks, or that he was lured into a false sense of security by a first click.

Mr. Schwartzberg's applied model airplane paint, which he admitted would not be permanent, to the locking pins to show that a user could discern when the hinge mechanism was properly locked by discerning when the color green (locked) as opposed to red (unlocked) appeared on the locking pins.  He also obtained a ladder from another manufacturer which used essentially the same type of locking mechanism and which incorporated colored metals in the pins. The fact that there is an alternative design of a product does not establish that the product under scrutiny is in fact defective.  The warning applied to the leg of the ladder demonstrating the positions of the palm buttons and locking pins in the locked and unlocked positions seems to make it apparent to any reasonable user when the hinged mechanism would be locked or unlocked.   A copy of the warning instruction in question is also appended to this ruling.

During argument, it was brought to the attention of the Court by defense counsel that there were several million (the number 5 comes to mind, resorting to memory) of this exact ladder being placed in the hands of prospective users and this is the very first claim predicated upon an alleged by defective hinge mechanism.  Mr. Schwartzberg opined that the physical evidence in this case could be consistent with the ladder having been locked in the A-Frame position and Mr. Coleman just losing his balance and falling off the ladder.  (Dep. 76-77).

What we have here is a case where there are no independent eye witnesses to the accident.  Mr. Coleman can furnish no information about the accident itself other than the fact

19

that he had the sensation of falling straight down.  Nothing in the evidence suggests that the ladder was not properly locked in the A-Frame position when the accident occurred because the physical evidence in this case as analyzed by Dr. Shelton makes a fall straight down impossible. The physical evidence mandates a conclusion that Mr. Coleman fell to his left, struck the wall, which also involved his feet pushing the ladder away from the wall and causing Mr. Coleman to fall on the ladder.  Both experts concede that the physical evidence is consistent with Mr. Coleman simply losing his balance and falling without regard to the hinge mechanism.  No physical evidence points to a problem with the hinged mechanism being implicated in this accident.  That being the case, evidence as to improper warnings concerning the mechanism or improper design of the mechanism becomes entirely irrelevant, whether it comes from proffered experts or otherwise.

## CONCLUSION

For the foregoing reasons, Mr. Schwartzberg will be precluded from testifying as an expert in either warnings or alleged design deficiencies in this case.

In conformity with the foregoing, it is hereby **ORDERED** that defendant's motion to exclude the expert testimony of Thomas Shelton is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant's motion to exclude the expert testimony of John Schwartzberg is **GRANTED.**

**THUS DONE AND SIGNED** in chambers at Alexandria, Louisiana, on this _____ day of

November, 2015.

_____
JUDGE JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE

APPENDIX 1





APPENDIX 2

